IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-759

Filed 16 April 2024

Swain County, No. 21JA29

IN THE MATTER OF: L.C.

Appeal by respondents from Order entered 5 January 2023 by Judge Donna F. Forga and Order entered 18 April 2023 by Judge Tessa Sellers in Swain County District Court. Heard in the Court of Appeals 21 March 2024.

*Kristy L. Parton for petitioner-appellee Swain County Department of Social Services.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, by Sam J. Ervin, IV, for the guardian ad litem.*

*Jeffrey William Gillette for respondent-appellant caretaker.*

*Parent Defender Wendy C. Sotolongo and Deputy Parent Defender Annick Lenoir-Peek for respondent-appellant mother.*

FLOOD, Judge.

Respondent-Mother and Respondent-Caretaker appeal from the trial court's 5 January 2023 Order adjudicating L.C. ("Layla")[1] a neglected juvenile. Upon review, we dismiss Respondent-Caretaker's appeal. As to Respondent-Mother's appeal, we

---

[1] A pseudonym is used to protect the identity of the juvenile and for ease of reading. *See* N.C.R. App. P. 42(b).

vacate the trial court's Adjudication and Disposition Orders and remand to the trial court for entry of new orders.

## I. **Factual and Procedural Background**

On 16 November 2021, Swain County Department of Social Services ("DSS") obtained nonsecure custody of Layla upon filing a petition alleging she was a neglected and dependent juvenile. The petition documented a history of substance abuse concerns, alleging there had been three prior Child Protective Services ("CPS") assessments based on reports of substance abuse. First, the petition alleged DSS received a CPS report in August 2019 after Respondent-Mother and Layla both tested positive for illegal substances, including methamphetamine and THC, at the time of Layla's birth. The petition alleged DSS's assessment resulted in a determination of "Services Not Recommended" since Respondent-Mother and her live-in girlfriend, Respondent-Caretaker, refused to submit to drug screens, and Layla was healthy and well cared for in a home where Respondent-Caretaker's mother served as a sober caregiver.

The petition further alleged DSS received additional reports of substance abuse by Respondent-Mother and Respondent-Caretaker in Layla's presence on 19 December 2019, 28 December 2020, and 9 February 2021. The petition provided DSS closed its second assessment based on the December 2019 report with a determination of "Services Not Recommended" because the substance abuse allegations could not be proven. DSS's third assessment focused on reports from

December 2020 and February 2021 that Respondent-Mother was "shooting up" in the home, Layla had grabbed a needle, Layla had stepped on Respondent-Mother's "meth pipe," and Layla had "mimicked shooting up drugs by holding a Children's Tylenol syringe to her arm." The petition alleged DSS's third assessment resulted in a decision of "Services Recommended" for substance abuse treatment for Respondent-Mother, but services were declined.

The petition provided DSS most recently received a CPS report on 30 October 2021 after Respondent-Mother gave birth to twins prematurely at thirty-one weeks and tested positive for fentanyl, methamphetamine, amphetamine, benzodiazepines, and THC when she was admitted.[2] DSS reported that it initiated a case with Respondent-Mother and Respondent-Caretaker on 31 October 2021 at the hospital in Buncombe County, North Carolina. The petition alleged Respondent-Mother and Respondent-Caretaker denied use of any illegal substances besides marijuana, and Respondent-Mother was "agitated and irate" at DSS's initiation of the case and refused drug screens for herself and the children. DSS reported Layla was found to be safe in the care of Respondent-Caretaker's mother.

The petition also detailed DSS's follow up visit with Respondent-Mother on 12 November 2021. The social worker reported Respondent-Mother "was clearly impaired on some type of substance[] and was hostile and exhibited bizarre behavior."

---

[2] Respondent-Mother relinquished her rights to Layla's twin siblings, and they are not subjects of this appeal.

The social worker further reported that Respondent-Mother refused a request to drug screen Layla as part of DSS's assessment, informing the social worker there was no need to screen Layla because she would test positive for methamphetamine and marijuana due to "spore to spore" contact with Respondent-Mother.

Based on Respondent-Mother's disclosure, DSS provided Respondent-Mother and Respondent-Caretaker a safety plan providing a Temporary Safety Provider ("TSP") for Layla to ensure she had a sober caregiver and was not exposed to substance abuse. The petition alleged Respondent-Mother initially "refused the [TSP] and ejected the [social workers] from her home," but the social worker was then able to speak with Respondent-Caretaker, who agreed to the safety plan and convinced Respondent-Mother to agree to Layla's placement with Respondent-Caretaker's mother as a TSP. Respondent-Mother signed a safety plan on 12 November 2021 that provided for a TSP and prohibited Respondent-Mother's and Respondent-Caretaker's unsupervised contact with Layla.

The petition alleged just days later, on 15 November 2021, that Respondent-Caretaker's mother informed DSS she was unable to continue as the TSP for Layla, that she had already told Respondent-Mother and Respondent-Caretaker she was unable to continue as the TSP before contacting DSS, and that Respondent-Mother and Respondent-Caretaker had taken Layla from the TSP in violation of the safety plan without indicating where they were going. Social workers searched for Layla and eventually found Respondent-Mother and Respondent-Caretaker downtown in

Bryson City, North Carolina, pushing Layla in a stroller. DSS assumed twelve-hour custody of Layla, filed the petition, and obtained nonsecure custody of Layla the following day.

The petition came on for an adjudication hearing on 7 December 2022.[3] On 5 January 2023, the trial court entered an Adjudication Order that adjudicated Layla to be a neglected juvenile. The trial court did not adjudicate Layla dependent. The initial disposition hearing was continued until 8 February 2023, after which the trial court entered a Disposition Order on 18 April 2023 that continued Layla's custody with DSS. Respondent-Mother and Respondent-Caretaker timely appealed from the Adjudication and Disposition Orders.

## II. Jurisdiction

"Any initial order of disposition and the adjudication order upon which it is based" may be appealed directly to this Court. N.C. Gen. Stat. § 7B-1001(a)(3) (2023).

## III. Analysis

### A. Respondent-Caretaker's Standing to Appeal

Although not addressed in briefing, we are compelled to first address the issue of Respondent-Caretaker's standing to appeal the Adjudication and Disposition

---

[3] The parties indicate the trial court had previously conducted an adjudication and disposition hearing on the petition and had entered orders from which Respondent-Mother had appealed. It was discovered during the preparation of the appeal, however, that the recording equipment had malfunctioned, and the proceedings could not be transcribed. The parties and the trial court agreed to set aside the initial adjudication and disposition.

Orders. *See In re T.B.*, 200 N.C. App. 739, 741–42, 685 S.E.2d 529, 531–32 (2009) ("Although [the r]espondent's brief does not address the issue of standing, we are compelled to address this issue."). "Standing is jurisdictional in nature and consequently, standing is a threshold issue that must be addressed, and found to exist, before the merits of the case are judicially resolved." *In re M.S.*, 247 N.C. App. 89, 92, 785 S.E.2d 590, 592 (2016) (internal quotation marks, citation, and brackets omitted). Respondent-Caretaker has the burden of establishing standing as the appealing party invoking this Court's jurisdiction. *See id.* at 92, 785 S.E.2d at 592.

"The right to appeal in juvenile actions arising under Chapter 7B is governed by N.C. Gen. Stat. § 7B-1001(a)." *In re P.S.*, 242 N.C. App. 430, 432, 775 S.E.2d 370, 371, *cert. denied*, 368 N.C. 431, 778 S.E.2d 277 (2015). Under that section, "[a]ny initial order of disposition and the adjudication order upon which it is based" may be appealed directly to this Court. N.C. Gen. Stat. § 7B-1001(a)(3). But the right to appeal an order under section 7B-1001 is afforded only to the following:

> (1) A juvenile acting through the juvenile's guardian ad litem previously appointed under [N.C. Gen. Stat. §] 7B-601 [2023].
>
> (2) A juvenile for whom no guardian ad litem has been appointed under [N.C. Gen. Stat. §] 7B-601 . . . .
>
> (3) A county department of social services.
>
> (4) A *parent*, a guardian appointed under [N.C. Gen. Stat. §] 7B-600 [2023] or Chapter 35A of the General Statutes, or a custodian as defined in [N.C. Gen. Stat. §] 7B-101 [2023] who is a nonprevailing party.

(5) Any party that sought but failed to obtain termination of parental rights.

N.C. Gen. Stat. § 7B-1002 (2023) (emphasis added).

As an initial matter, we note Respondent-Caretaker would not have been able to become Layla's parent by adoption in North Carolina unless Respondent-Mother's—and any potential biological father's—parental rights were terminated. In *Boseman v. Jarrell*, the biological mother and her female partner were able to obtain a decree of adoption by the female partner as sharing in parentage with the biological mother based upon an erroneous interpretation of North Carolina's adoption law recognized at that time in Durham County. 364 N.C. 537, 541, 704 S.E.2d 494, 497 (2010). Our Supreme Court held the adoption decree was void *ab initio* because the petitioner was "seeking relief unavailable under our General Statutes[,]" and "the adoption proceeding at issue in this case was not 'commenced under' Chapter 48 of our General Statutes." *Id.* at 546, 704 S.E.2d at 501.

This case presents a similar situation to the extent the trial court simply accepted without question Respondent-Mother's and Respondent-Caretaker's declaration of Respondent-Caretaker's legal status as "father." Like the Supreme Court in *Boseman* in addressing adoption, as to paternity here,

> we recognize that many policy arguments have been made to this Court that the [claim of paternity] in this case ought to be allowed. However, adoption is a statutory creation. Accordingly, those arguments are appropriately addressed to our General Assembly. Until the legislature changes the provisions of Chapter 48, we must recognize the statutory

limitations on the adoption decrees that may be entered. Because the adoption decree is void, [the] plaintiff is not legally recognized as the minor child's parent.

*Id.* at 548–49, 704 S.E.2d at 502 (citation omitted). Likewise, here, the trial court had no authority to create a new method of establishing paternity or Respondent-Caretaker's status as a parent, without compliance with North Carolina's statutes.

It is clear in this case that Respondent-Caretaker is not the juvenile, a court-appointed guardian ad litem ("GAL"), a county department of social services, a parent, a guardian appointed under any statute, a custodian as defined in section 7B-101, or a party who unsuccessfully sought termination of parental rights. Respondent-Caretaker is a "caretaker" as defined by section 7B-101(3):

> (3) Caretaker.--Any person other than a parent, guardian, or custodian who has responsibility for the health and welfare of a juvenile in a residential setting. A person responsible for a juvenile's health and welfare means a stepparent; foster parent; an adult member of the juvenile's household; an adult entrusted with the juvenile's care; a potential adoptive parent during a visit or trial placement with a juvenile in the custody of a department; any person such as a house parent or cottage parent who has primary responsibility for supervising a juvenile's health and welfare in a residential child care facility or residential educational facility; or any employee or volunteer of a division, institution, or school operated by the Department of Health and Human Services.

N.C. Gen. Stat. § 7B-101(3) (2023).

Early in this case, the trial court began referring to Respondent-Caretaker as "Respondent/father" and as a "parent" and treating her as Layla's legal father.

Although the Petition identified Respondent-Caretaker as "the female live-in girlfriend of . . . Respondent[-]Mother[,]" it also alleged she was identified as the child's *father* on her birth certificate. The trial court apparently relied upon the report of the birth certificate to treat Respondent-Caretaker as "father."[4] Although Respondent-Caretaker's role in *acting* as a parent to Layla is not in dispute, it is also undisputed that Respondent-Caretaker is a woman, and she is not the father of the child either legally or biologically.

The terms "father" and "parent" are not defined in Chapter 7B. But as this Court recently held in *Green v. Carter*, No. COA22-494, 2024 WL 1171919, at \*1 (N.C. Ct. App. 19 Mar. 2024), the term "father" is a gender-specific term, and a man's status as "father" of a child is based either upon his biological participation in the child's creation and birth or upon an adjudication of paternity or parental status based upon specific methods as defined by statute. "[A] 'father' is the male parent of a child, whether as a biological parent, by adoption, by legitimation, or by adjudication of paternity." *Id.* at \*1. The terms "father" and "parent" as used in Chapter 7B of the North Carolina General Statutes are indistinguishable from the same terms as used in Chapter 50. Although we recognize that some other states may define parentage differently, there is no indication that the law of any state other than North Carolina

---

[4] There is no birth certificate for Layla in our Record on appeal, and it was not presented as evidence at the hearings relevant to the orders on appeal.

may be relevant to Respondent-Caretaker's alleged status as a "father." The Affidavits of Status of Minor Child as required by N.C. Gen. Stat. § 50A-209, and DSS records in evidence here, indicate that Layla was born in Buncombe County. The first report to DSS regarding Layla was upon her birth in August of 2019, when "Swain DSS received a CPS report with allegations that [Respondent-Mother] had no prenatal care and tested positive for Methamphetamine, Amphetamine, and THC at [Layla's] birth." Layla was born in North Carolina and has resided in North Carolina her entire life.

We also recognize that a birth certificate can create a rebuttable presumption of paternity. Respondent-Mother was not married when Layla was born and at the time of the hearing was still unmarried. Layla's birth certificate would be governed by N.C. Gen. Stat. § 130A-101:

> (f) If the mother was unmarried at all times from date of conception through date of birth, the name of the father shall not be entered on the certificate unless the child's mother and father complete an affidavit acknowledging paternity which contains the following:
>
> (1) *A sworn statement by the mother consenting to the assertion of paternity by the father and declaring that the father is the child's natural father* and that the mother was unmarried at all times from the date of conception through the date of birth;
> (2) *A sworn statement by the father declaring that he believes he is the natural father of the child;*
> (3) Information explaining in plain language the effect of signing the affidavit, including a statement of parental rights and responsibilities and an acknowledgment of the receipt of this information; and

(4) The social security numbers of both parents.

The State Registrar, in consultation with the Child Support Enforcement Section of the Division of Social Services, shall develop and disseminate a form affidavit for use in compliance with this section, together with an information sheet that contains all the information required to be disclosed by subdivision (3) of this subsection.

Upon the execution of the affidavit, the declaring father shall be listed as the father on the birth certificate, subject to the declaring father's right to rescind under [N.C. Gen. Stat. §] 110-132. The executed affidavit shall be filed with the registrar along with the birth certificate. In the event paternity is properly placed at issue, a certified copy of the affidavit shall be admissible in any action to establish paternity. The surname of the child shall be determined by the mother, except if the father's name is entered on the certificate, the mother and father shall agree upon the child's surname. If there is no agreement, the child's surname shall be the same as that of the mother.

N.C. Gen. Stat. § 130A-101 (2023) (emphasis added).

If Respondent-Caretaker were a man, the name listed on the birth certificate as "father" could be used to establish at least a rebuttable presumption of paternity. *See In re J.K.C.*, 218 N.C. App. 22, 37, 721 S.E.2d 264, 274 (2012) ("If a child born to a marriage is presumed to be legitimate, we see no reason why a similar presumption should not arise where a child's birth certificate identifies its father, as our statutory scheme requires a determination of paternity by affidavit or judicially before the father's name can be shown on the birth certificate. Of course, this presumption can be rebutted, but in this case, there is no evidence to rebut the presumption raised by

the birth certificates."). But there can be no presumption, rebuttable or otherwise, of paternity for a woman. *Paternity* as defined by North Carolina law is simply not possible for a woman; only maternity is possible for a woman. *See Carter*, at \*6 ("While North Carolina statutes do address legitimation and adjudication of paternity in North Carolina General Statutes Chapter 49, Articles 2 and 3, these statutes address male parents—fathers—and they do not address maternity." (citations omitted)).

Thus, as used in N.C. Gen. Stat. § 50-13.4 "mother" is the female parent of a child and "father" is the male parent of a child, either biologically or by adoption or other legal process to establish paternity. N.C. Gen. Stat. § 50-13.4. The mother and father are also referred to as "parents." The definition of "parent" for purposes of N.C. Gen. Stat. § 50-13.4 is the same for purposes of N.C. Gen. Stat. Chapter 7B, including N.C. Gen. Stat. § 7B-1001(a). A woman cannot become a "father" as defined by the law of North Carolina merely by having her name listed on a birth certificate, even with the collusion of the birth mother. Even if we assume both Respondent-Mother and Respondent-Caretaker filed affidavits as required by N.C. Gen. Stat. §130A-101(f), falsely declaring that Respondent-Caretaker is Layla's "natural father," Respondent-Mother testified at the adjudication hearing in December 2022 in this action that Respondent-Caretaker "is not the biological father of [Layla]" and "she's not the sperm donor." Respondent-Mother also identified by name a man she

believed was "a possibility maybe" as the biological father but she had not had contact with him "in a few years."[5]

The Record, therefore, does not show that Respondent-Caretaker has any legal status or rights as a father or as a parent under Chapter 7B. Notwithstanding this lack of legal status or rights, the trial court appointed counsel for Respondent-Caretaker, apparently based upon the idea that she was a "parent." Under N.C. Gen. Stat. § 7B-1101.1, only a "parent" has a right to court-appointed counsel: "(a) The *parent* has the right to counsel, and to appointed counsel in cases of indigency, unless *the parent* waives the right. The fees of appointed counsel shall be borne by the Office of Indigent Defense Services." N.C. Gen. Stat. § 7B-1101.1(a). Since the General Assembly has established a right to appointed counsel for parents only, providing that the Office of Indigent Defense Services, and ultimately the taxpayers of North Carolina, pay for the representation of indigent *parents*, there is no statutory authority for the trial court to appoint counsel for any parties other than the parents. Lastly, there is no indication in the Record that Respondent-Caretaker was ever appointed as Layla's legal guardian or custodian. Respondent-Caretaker is therefore not one of the parties with a right to appeal under N.C. Gen. Stat. § 7B-1002.

---

[5] In the DSS Court Summary for the disposition hearing, filed 8 February 2023, DSS noted regarding paternity that "Paternity for [Layla] has not been identified. Respondent-Mother states the possibilities of paternity are 'endless.'" DSS also noted Respondent-Caretaker was listed on the birth certificate as "father."

As an "adult member of the juvenile's household[,]" "other than a parent, guardian, or custodian[,]" Respondent-Caretaker is properly classified as a "caretaker" under N.C. Gen. Stat. § 7B-101(3). Since a caretaker does not have standing to appeal under N.C. Gen. Stat. § 7B-1002, we dismiss Respondent-Caretaker's appeal.

**B. Respondent-Mother's Appeal**

On appeal, Respondent-Mother challenges specific findings of fact and the trial court's adjudication of Layla as a neglected juvenile. She does not challenge the trial court's Disposition Order. Nevertheless, if we vacate the Adjudication Order, the Disposition Order based thereon must also necessarily be vacated.

1. <u>Standard of Review</u>

"We review an adjudication under N.C. Gen. Stat. § 7B-807 [2023] to determine whether the trial court's findings of fact are supported by clear and convincing competent evidence and whether the court's findings support its conclusions of law." *In re M.H.*, 272 N.C. App. 283, 286, 845 S.E.2d 908, 911 (2020) (internal quotation marks and citation omitted). "Clear and convincing evidence is evidence which should fully convince." *In re D.S.*, 286 N.C. App. 1, 11, 879 S.E.2d 335, 343 (2022) (citation and internal quotation marks omitted). "If such evidence exists, the findings of the trial court are binding on appeal, even if the evidence would support a finding to the contrary." *In re T.H.T.*, 185 N.C. App. 337, 343, 648 S.E.2d 519, 523 (2007), *aff'd as modified*, 362 N.C. 446, 665 S.E.2d 54 (2008). "Unchallenged findings of fact

are binding on appeal." *In re K.W.*, 272 N.C. App. 487, 490, 846 S.E.2d 584, 588 (2020). "[W]e review a trial court's conclusions of law de novo." *In re N.K.*, 274 N.C. App. 5, 8, 851 S.E.2d 389, 392 (2020) (quoting *In re M.H.*, 272 N.C. App. at 286, 845 S.E.2d at 911). "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the [trial court]." *In re K.S.*, 380 N.C. 60, 64, 868 S.E.2d 1, 4 (2022) (citation and internal quotation marks omitted). "The determination that a child is 'neglected' is a conclusion of law we review de novo." *In re J.C.M.J.C.*, 268 N.C. App. 47, 51, 834 S.E.2d 670, 674 (2019).

## 2. Findings of Fact

Respondent-Mother challenges findings of fact 5, 8, 9, 18, 19, 20, 23, and 24. Many of her arguments do not contest the sufficiency of the evidence to support the findings. She instead challenges the findings as irrelevant to the adjudication of neglect. We address each of the challenged findings.

The trial court found in Finding of Fact 5 "there was a prior report in 2019, when [Layla] was born, that she was born with methamphetamine and THC in her system." Respondent relies on *In re S.D.A.*, 170 N.C. App. 354, 612 S.E.2d 362 (2005), to argue the finding should be struck because "[a]n unsubstantiated report cannot form the basis of an adjudication." Notably, Respondent-Mother does not argue the finding is not supported by evidence, and for good reason. Respondent-Mother testified DSS became involved at Layla's birth on 8 August 2019 because she and Layla tested positive for methamphetamine and THC. Finding of Fact 5 is thus

supported by the evidence. Furthermore, while this Court held in *In re S.D.A.*, 170 N.C. App. at 361, 612 S.E.2d at 366 that a trial court lacks jurisdiction to proceed to adjudication based on an unsubstantiated report, that is not what happened in this case, and *In re S.D.A.* in inapplicable. DSS did not file the petition and the trial court did not proceed to adjudication based on the January 2019 report. DSS filed the petition based on its assessment following its receipt of a CPS report in October 2021 and its investigation in October and November 2021. The fact that DSS received a report upon Layla's birth in 2019 is relevant to establish the history of DSS's involvement, but Respondent-Mother is correct that the prior report alone is insufficient to support the adjudication. *See In re J.A.M.*, 372 N.C. 1, 9, 822 S.E.2d 693, 698 (2019) (considering the historical facts of the case in combination with factors indicating a present risk to the child and holding "the clear and convincing evidence in the record must show current circumstances that present a risk to the juvenile"). Moreover, we note the trial court did not address in Finding of Fact 5 the veracity of the prior report, and our consideration of the finding is therefore limited to the fact that "there was a prior report in 2019, when [Layla] was born, that she was born with methamphetamine and THC in her system."

Challenged Findings of Fact 8 and 9 address Respondent-Mother's response to a social worker's request to drug screen Layla. The findings relate to unchallenged Finding of Fact 7, in which the trial court found a social worker went to Respondent-Mother's home on 12 November 2021 to follow up on a report, at which time

Respondent-Mother "reported that substance abuse had been an issue for her" and "admitted she was a prior heroin addict and admitted to using multiple drugs, including crystal meth, marijuana, benzos and other medications."

In Finding of Fact 8, the trial court found, "when asked if the [R]espondent[-M]other would allow [Layla] to be screened for drugs, [Respondent-Mother] stated, 'no' and that . . . DSS was only good for breaking up families." Respondent-Mother contends this finding fails to account for evidence that she offered to have Layla tested by her own provider. Respondent-Mother, however, does not dispute she refused to allow DSS to drug screen Layla, and the social worker's testimony about the encounter supports the finding, which is therefore binding.

In Finding of Fact 9, the trial court found "[R]espondent[-M]other relayed that [Layla] may test positive for controlled substances due to 'spore to spore' contact, but the court has no information or knowledge of what that term means." The trial court's finding that Respondent-Mother asserted Layla "may test positive" is directly supported by testimony from both Respondent-Mother and the social worker. Respondent-Mother does not challenge the first portion of the finding but takes issue with the trial court's finding that it had no knowledge of what "spore to spore" meant. A review of the testimony shows that both Respondent-Mother and the social worker testified about "spore to spore"—Respondent-Mother stating she meant touch, and the social worker testifying that she understood Respondent-Mother to mean skin-to-skin. Because there was an explanation of "spore to spore," the trial court's finding

that it "has no information or knowledge of what that term means" is not supported by the evidence. We cannot disregard the trial court's uncertainty about Respondent-Mother's disclosure, however, which is evident in the finding.

Respondent-Mother also challenges Finding of Fact 18, in which the trial court found "[R]espondent[-]Mother testified that she could not remember much after [Layla] was taken from her because she drank a lot of fireballs to the point that she was blacking out and found herself in the bathtub without knowledge of how she got there." The finding is based on Respondent-Mother's testimony about her actions during the week following the filing of the petition and Layla's placement in nonsecure custody. Although Respondent-Mother eventually objected to the GAL's questioning on the basis that her actions were post-petition and irrelevant, and although the trial court sustained the objection, Respondent-Mother did not move to strike the testimony that supported the finding. Respondent-Mother is nevertheless correct that the finding concerns post-petition evidence and is irrelevant for adjudication purposes.

"The adjudicatory hearing [is] a judicial process designed to adjudicate the existence or nonexistence of any of the conditions alleged in a petition." *In re L.N.H.*, 382 N.C. 536, 543, 879 S.E.2d 138, 144 (2022) (quoting N.C. Gen. Stat. § 7B-802 (2023)). "This inquiry focuses on the status of the child at the time the petition is filed, not the post-petition actions of a party." *Id* at 543, 879 S.E.2d at 144. Thus, "post-petition evidence generally is not admissible during an adjudicatory hearing for

abuse, neglect or dependency." *In re V.B.*, 239 N.C. App. 340, 344, 768 S.E.2d 867, 869 (2015) (citing *In re A.B.*, 179 N.C. App. 605, 609, 635 S.E.2d 11, 15 (2006)). While the prohibition on post-petition evidence is not absolute, the limited instances in which this Court has upheld the admission of post-petition evidence have involved "fixed and ongoing circumstance[s]" relevant to the existence or nonexistence of conditions alleged in a juvenile petition, such as mental illness or paternity. *In re G.W.*, 286 N.C. App. 587, 594, 882 S.E.2d 81, 88 (2022) (citation omitted). Since Finding of Fact 18 concerns specific actions by Respondent-Mother following the filing of the petition, the finding is irrelevant to prove the allegations in the petition, and we will disregard it in our review of the adjudication of neglect. *See, e.g., id.* at 596, 882 S.E.2d at 89 (holding evidence of post-petition drug use and drug screens were irrelevant for purposes of adjudication).

The trial court found in challenged Finding of Fact 19 that "during at least one interaction with the social worker,[] [R]espondent[-M]other was irate, threatened [a relative of Respondent-Caretaker], and admitted to a willingness to threaten [the relative]." We first note the finding is directly supported by Respondent-Mother's testimony that she threatened Respondent-Caretaker's cousin when the cousin inquired about the social worker's visit. Respondent-Mother does not dispute she made the threat but instead argues the finding is improperly considered for adjudication purposes because the threat was not alleged in the petition, and there was no evidence Layla was present for the threat. We are not fully persuaded the

finding does not relate to conditions alleged in the petition. Although there was no allegation of the specific threat, the petition included allegations that Respondent-Mother was "agitated and irate" with DSS's involvement. The finding that she was irate and threatened a relative during an interaction with a social worker is illustrative of Respondent-Mother's interactions with DSS and her mental state prior to DSS's filing of the petition, which is relevant to the adjudication.

In Finding of Fact 20, the trial court found Respondent-Mother "refused to supply to the court information regarding where she had obtained the valium that she took." Again, Respondent-Mother does not argue the finding is not supported by the evidence, and the Record supports the finding and shows Respondent-Mother was ultimately held in contempt for her refusal to answer. We nevertheless agree with Respondent-Mother that the finding is irrelevant for an adjudication of the existence or nonexistence of the conditions alleged in the petition since her refusal occurred at the adjudication hearing and was not a basis for DSS filing the petition. *See In re L.N.H.*, 382 N.C. at 543, 879 S.E.2d at 144; *see also* N.C. Gen. Stat. § 7B-802. Consequently, we will not consider the finding in reviewing the adjudication of neglect.

Respondent-Mother also challenges the portion of Finding of Fact 23 that she "could not convey to the court any clear timeline as to how long [Layla's] siblings were in the NICU after their birth." This finding is a direct reflection of Respondent-Mother's testimony at the adjudication hearing and is therefore supported by the

evidence. Respondent-Mother argues, however, this portion should be struck or disregarded because it concerns Layla's siblings, who were not subjects of the adjudication. While this portion addresses Respondent-Mother's knowledge of the siblings' hospitalization, more generally this portion is relevant to Respondent-Mother's mental state and ability to care for a child during the period DSS was investigating the case in October and November 2021, just prior to the filing of the petition. This portion of Finding of Fact 23 is thus relevant to Layla's adjudication.

Lastly, Respondent-Mother challenges Finding of Fact 24—"it is contrary to the best interests of the juvenile to return to the home of the respondent parents [sic] at this time"—as a dispositional finding that was not appropriate for adjudication. Respondent-Mother asserts Conclusion of Law 4, which similarly addresses Layla's best interests, should also be struck. While protecting the best interests of a child is a goal in all stages of an abuse, neglect, and dependency proceeding, it is the dispositional stage where the trial court designs a plan to ensure the wellbeing of the child based on a determination of the child's best interests. *See* N.C. Gen. Stat. §§ 7B-900–901(a) (2023); *see also In re K.W.*, 272 N.C. App. at 491, 846 S.E.2d at 589 (explaining that the trial court determines a child's placement based on the best interests of the child at the dispositional stage). Since Finding of Fact 24 is clearly made for purposes of disposition and not adjudication, we will disregard it in reviewing the adjudication of neglect. We note, however, the trial court's inclusion of Finding of Fact 24 and Conclusion of Law 4 in the Adjudication Order was not error

since the initial dispositional hearing required by N.C. Gen. Stat. § 7B-901 was continued, and the finding supported the court's interim dispositional ruling.

### 3. Neglect

Respondent-Mother next challenges the trial court's conclusion Layla was a "neglected juvenile in that she resides in an environment injurious to her welfare and she does not receive appropriate care, supervision or discipline from her parent, guardian, custodian or caretaker." Respondent-Mother argues the conclusion is not supported by the trial court's findings of fact because there were no findings showing Layla suffered any physical, mental, or emotional impairment, or that there was a substantial risk of impairment to Layla. We agree the trial court's findings were insufficient to support the adjudication of neglect.

Relevant to this case, a "neglected juvenile" is defined in the Juvenile Code to include "[a]ny juvenile less than [eighteen] years of age . . . whose parent, guardian, custodian, or caretaker . . . [d]oes not provide proper care, supervision, or discipline . . . [or c]reates or allows to be created a living environment that is injurious to the juvenile's welfare." N.C. Gen. Stat. § 7B-101(15). To adjudicate a child neglected, "[t]his Court has consistently required that there be some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment as a consequence of the failure to provide proper care, supervision, or discipline." *In re D.B.J.*, 197 N.C. App. 752, 755, 678 S.E.2d 778, 780 (2009) (citation and internal quotation marks omitted). "Similarly, in order for a court to find that the child

resided in an injurious environment, evidence must show that the environment in which the child resided has resulted in harm to the child or a substantial risk of harm." *In re K.J.B.*, 248 N.C. App. 352, 354, 797 S.E.2d 516, 518 (2016) (citation omitted).

"It is well-established that the trial court need not wait for actual harm to occur to the child if there is a substantial risk of harm to the child in the home." *In re D.B.J.*, 197 N.C. App. at 755, 678 S.E.2d at 780–81 (quoting *In re T.S., III*, 178 N.C. App. 110, 113, 631 S.E.2d 19, 22 (2006), *aff'd per curiam on other ground*, 361 N.C. 231, 641 S.E.2d 302 (2007)). "[T]he trial court [has] some discretion in determining whether children are at risk for a particular kind of harm given their age and the environment in which they reside." *In re C.M.*, 183 N.C. App. 207, 210, 644 S.E.2d 588, 592 (2007) (citation and internal quotation marks omitted). Our Supreme Court has also directed that although "there is no requirement of a specific written finding of a substantial risk of impairment . . . the trial court must make written findings of fact sufficient to support its conclusion of law of neglect." *In re G.C.*, 384 N.C. 62, 69, 884 S.E.2d 658, 663 (2023).

It is this additional required element of findings sufficient to support a conclusion of physical, mental, or emotional impairment, or a substantial risk of such impairment, that Respondent-Mother argues is lacking in Layla's adjudication. Respondent-Mother does not deny that the evidence and findings establish she "has struggled with substance abuse during [Layla's] entire lifetime[.]" She nonetheless

contends her substance abuse alone is insufficient to support the adjudication of neglect where there were no findings to support a determination that her substance abuse resulted in Layla's physical, mental, or emotional impairment or a substantial risk of impairment. *See In re Phifer,* 67 N.C. App. 16, 25, 312 S.E.2d 684, 689 (1984) (holding "[a] finding of fact that a parent abuses alcohol, without proof of adverse impact upon the child, is not a sufficient basis for an adjudication of termination of parental rights for neglect"); *see In re K.J.B.*, 248 N.C. App. at 356–57, 797 S.E.2d at 519 (reversing an adjudication of neglect where there was no evidence a child suffered impairment or substantial risk of impairment as a result of the mother's alcohol abuse while the child was in the care of another adult).

DSS and the GAL maintain that, even though the trial court did not make an explicit determination that Layla suffered impairment or was at substantial risk of impairment, the totality of the evidence on the conditions in the home clearly supported such a determination. They argue the substance abuse in the instant case was more substantial than the abuse in *In re Phifer* and *In re K.J.B.*, on which Respondent-Mother relies. They additionally argue the condition of the home, Respondent-Mother's erratic and threatening behavior when dealing with DSS, and Respondent-Mother's and Respondent-Caretaker's violation of a safety agreement with DSS all support a determination that Layla suffered a substantial risk of impairment.

Because the trial court did not make a specific finding of impairment or substantial risk of impairment, we must review the trial court's findings to see if the evidence supports the ultimate finding. *See In re B.P.*, 257 N.C. App. at 433, 809 S.E.2d at 919. DSS and the GAL are correct that this Court "is required to consider the totality of the evidence to determine whether the trial court's findings sufficiently support its ultimate conclusion that [Layla] is a neglected juvenile." *In re F.S.*, 268 N.C. App. 34, 43, 835 S.E.2d 465, 471 (2019). But this Court cannot assume findings of fact the trial court did not make, even if there is evidence to support such findings. Only the trial court has the duty to evaluate the weight and credibility of the evidence and based upon that evaluation, to make findings of fact. *See In re A.H.D.*, 287 N.C. App. 548, 564, 883 S.E.2d 492, 504 (2023) ("The trial court has the duty of determining the credibility and weight of all the evidence, and only the trial court can make the findings of fact resolving any conflicts in the evidence."); *see, e.g., In re D.W.P.*, 373 N.C. 327, 330, 838 S.E.2d 396, 400 (2020) ("[I]t is the duty of the trial judge to pass upon the credibility of the witnesses and the weight to be given their testimony and the reasonable inferences to be drawn therefrom. The trial judge's decisions as to the weight and credibility of the evidence, and the inferences drawn from the evidence are not subject to appellate review." (citations and internal quotation marks omitted) (cleaned up)).

Upon review of the evidence and Order in this case, however, we agree with Respondent-Mother that the trial court's findings are inadequate to support a

determination Layla suffered physical, mental, or emotional impairment, or that she was at substantial risk of impairment.

We first note that many of the trial court's findings of fact are essentially recitations of evidence. For example, six of the findings of fact state that Respondent-Mother "testified," "reported," or "offered evidence" of various things. Even considering all of the findings in the context of the adjudication order, it is not clear if the trial court actually found these "facts" to be true or if the findings are simply findings that Respondent-Mother testified about these things. Although "[t]here is nothing impermissible about describing testimony" the trial court must "ultimately make[ ] its own findings, resolving any material disputes." *In re C.L.C.*, 171 N.C. App. 438, 446, 615 S.E.2d 704, 708 (2005), *aff'd in part, rev. dismissed in part*, 360 N.C. 475, 628 S.E.2d 760 (2006). Here, some of the findings "describe testimony" but do not make the trial court's actual determination about that testimony clear.

The trial court's findings do clearly establish that substance abuse was the predominant issue in this case. The trial court found DSS had multiple prior encounters with the family involving Layla based on reports of substance abuse. The trial court found the prior reports included a 2019 report that Layla was born with methamphetamine and THC in her system, and a 2020 report that Layla had grabbed a needle and that Respondent-Mother was selling drugs out of the house. The trial court also found Respondent-Mother admitted to more recent drug use prior to the birth of Layla's twin siblings, including taking half a valium and smoking marijuana

regularly. The trial court found Respondent-Mother "could not convey to the court any clear timeline as to how long [Layla's] siblings were in the NICU after their birth[,]"and when DSS followed up on a report of substance abuse on 12 November 2021, just days before filing the petition, "[R]espondent[-M]other reported that substance abuse had been an issue for her" and "admitted that she was a prior heroin addict and admitted to using multiple drugs, including crystal meth, marijuana, benzos, and other medications."

The trial court's findings also reflect Respondent-Mother's unwillingness to work with DSS. The trial court found Respondent-Mother refused DSS's request to drug screen Layla and "relayed that [Layla] may test positive for controlled substances[.]" The trial court also found Respondent-Mother and Respondent-Caretaker initially refused to sign a safety plan with DSS, eventually agreed to the safety plan, and then violated the safety plan days later by removing Layla from the TSP. The trial court found DSS located Layla with Respondent-Mother and Respondent-Caretaker and without a suitable supervisor.

These findings are the extent of the trial court's findings concerning substance abuse in the home and Respondent-Mother's unwillingness to work with DSS. The findings do not address the impact on Layla as required to support an adjudication of neglect. *See In re K.J.B.*, 248 N.C. App. at 355, 797 S.E.2d at 518–19 (citing *In re E.P.*, 183 N.C. App. 301, 304–05, 645 S.E.2d 772, 774, *aff'd per curiam*, 362 N.C. 82,

653 S.E.2d 143 (2007) ("[A] parent's substance abuse problem alone [does] not support an adjudication of neglect.")).

Notably, the trial court did not find the prior reports of substance abuse involving Layla were true and did not make any findings about the results of DSS's assessments to show whether Layla was harmed or at a substantial risk of harm. It is also notable that the petition filed by DSS alleged DSS closed the case on the 2019 report that Layla was born with substances in her system with a decision of "Services Not Recommended" because Layla was healthy, well cared for, and resided in a home where Respondent-Caretaker's mother was a sober caregiver, indicating Layla was not harmed or at risk of substantial harm at the time. Evidence at the adjudication hearing showed Layla was often in the care of Respondent-Caretaker's mother, who was a sober caregiver. There were no findings that drug use occurred in Layla's presence, Layla was exposed to controlled substances, or Layla was ever without a sober caregiver.

DSS asserts the trial court appropriately inferred Layla was exposed to drug use based on Respondent-Mother's assertion that Layla "may test positive for controlled substances due to 'spore to spore' contact," as found in Finding of Fact 9. While the trial court determines the inferences to be drawn from the evidence, *see In re T.H.T.*, 185 N.C. App. at 343, 648 S.E.2d at 523, here the trial court made no findings in the Adjudication Order that Layla was exposed to drug use, although the evidence would allow that inference. Finding of Fact 9, itself, is not a finding Layla

was exposed to drug use. The trial court furthermore cast doubt on Respondent-Mother's assertion that Layla "may test positive" by finding the court was uncertain what Respondent-Mother meant by "spore to spore contact[.]"

Similarly, while the trial court found Respondent-Mother and Respondent-Caretaker violated the safety plan, and Layla was found in their care without a suitable supervisor, the trial court did not make findings as to the impact on Layla. No evidence was presented that Layla was harmed or at a substantial risk of harm due to the violation of the safety plan. The evidence at the adjudication hearing was that the TSP informed Respondent-Mother and Respondent-Caretaker that she could no longer care for Layla, before the TSP informed DSS of the same, and that Respondent-Mother and Respondent-Caretaker picked Layla up to go to a doctor's appointment. There is no evidence or findings that Layla was adversely affected by the safety plan violation.

DSS and the GAL also argue evidence the home was a safety concern and Respondent-Mother had exhibited threatening behavior supported a determination that Layla was impaired or at a substantial risk of impairment. The trial court addressed in Findings of Fact 11 and 19 the condition of the home and Respondent-Mother's threat.

To place Finding of Fact 11 in context, we note some additional findings:

> 10. The social worker returned to the home on November 12, 2021 for a second visit. At that time . . . [R]espondent[-]Mother and [Respondent-C]aretaker were offered a safety

plan which was admitted into evidence as DSS 1.

11. That there was discussion about rats in the building and holes in the walls of [Respondent-Mother's] home. [R]espondent[-M]other believed the rats would come out of the holes in the walls and cabinets and try to bite her.

12. That a DSS worker was present in the home on the 1st occasion for 1.5 hrs. and the second occasion for 45 minutes.

In Finding of Fact 11, the trial court found "there was discussion about rats in the building and holes in the walls[.]" The court further found Respondent-Mother "believed the rats would come out of the holes in the walls and cabinets and try to bite her." While the finding shows there was a *discussion* about "rats in the building and holes in the walls" between Respondent-Mother and the social worker, the trial court did not find the home was unsuitable or unsafe for Layla, and no evidence was presented showing the condition of the home put Layla at risk. In fact, based on the evidence it seems this finding regarding rats indicates some sort of hallucination by Respondent-Mother that rats would come out of the walls and bite her, not that the home was actually so infested by rats that it would pose a physical threat to anyone in the home. Either possibility could indicate a risk of substantial harm to the child; a parent who is suffering from hallucinations from drug impairment or mental illness may be unable to care for a child due to her mental impairment, while a parent who allows such an extensive rat infestation that rats pose a physical threat to a child presents an entirely different type of risk. From the trial court's findings, we cannot

ascertain if it determined that these facts indicated either type of risk of harm, or some other sort of risk, to Layla.

The Safety Assessment by DSS on 12 November 2021 indicates the only two "safety indicators" DSS considered on that date as exposing Layla to physical harm or a "plausible threat to cause serious physical harm" were (1) being a "drug-exposed infant/child" and (2) "a current, ongoing pattern of substance abuse that leads directly to neglect and/or abuse of the child." As to this latter factor, the social worker noted, "substance use has been identified as a pattern, but [Respondent-Caretaker's mother] is the sober caregiver of the household." Notably, the Safety Assessment found no safety indicators related to "physical living conditions" as "hazardous and immediately threating to the health and/or safety of the child." The Safety Plan presented by DSS on 12 November 2021 addressed only substance abuse issues and did not include any requirements for remediation of any conditions at Respondent-Mother's home.

The testimony as to Respondent-Mother's comments about the rats was conflicting. Respondent-Mother testified that she told the social worker about rats coming in the house and holes in the floor:

> Q. Okay. You said that you were showing her rats and holes in the walls?
> A. Yes.
> Q. Where are the rats in relation to -- where were the rats?
> A. Outside of our home. We had had an issue with very large, large rats coming from the brewery across the street and had been to social services three or four times trying to

get help with the landlord.
Q. Okay. And where were the holes in the walls that you were showing?
A. They were in the flooring where I fell through when I was pregnant.

In contrast, the social worker characterized Respondent-Mother's comments about rats that day as indicating she may be impaired by substances:

A. She was speaking very erratically. She was moving her arms a lot. She wasn't -- she couldn't stay focused like on the topic.
Q. Did she appear to be in any kind of distress?
A. It depends on what you call distress.
Q. What -- how would you characterize it?
A. I wouldn't say she's in distress. I thought that she might be using substances at the time.
Q. Okay. Did she mention to you anything about rats in [the] building or holes in the wall?
A. Yes, she did.
Q. Under -- how did that -- how did those -- subject come up?
A. We were doing the home check of the home and she had mentioned that there was a rat problem and that rats would come out the cabinets and the holes and try to bite her.

The evidence, therefore, would allow the trial court to make findings regarding the type of risk posed by Respondent-Mother's erratic behavior and claims about rats in the house, but the findings do not clarify the nature of any potential risk to Layla.

Regarding Respondent-Mother's threatening behavior, the trial court found in Finding of Fact 19 that, "during at least one interaction with the social worker, [R]espondent[-M]other was irate, threatened [Respondent-Caretaker's cousin], and admitted to a willingness to threaten [the cousin]." Again, there is no indication

Respondent-Mother's behavior affected Layla. The evidence at the hearing was that Layla was in the care of Respondent-Caretaker's mother and not present at the time of the interaction. Although there was evidence that would allow the trial court to make clearer findings about Respondent-Mother's threatening behavior, the findings about the condition of the home and Respondent-Mother's threatening behavior do not support a determination that Layla suffered impairment or was at substantial risk of impairment.

In short, the Adjudication Order lacks specific findings regarding the impact on Layla of the substance abuse, the violation of the safety plan, the condition of the home, or Respondent-Mother's erratic or threatening behavior. DSS largely relies on testimony from the adjudication hearing to argue the evidence supported a determination Layla was impaired or at substantial risk of impairment. The trial court, however, failed to make findings based on much of the evidence presented in support of the conditions alleged in the petition. While this Court has held there is no error when "there is no finding that the juvenile had been impaired or is at a substantial risk of impairment . . . if all the evidence supports such a finding[,]" *In re B.P.*, 257 N.C. App. at 433, 809 S.E.2d at 919 (quoting *In re Padgett*, 156 N.C. App. at 648, 577 S.E.2d at 340), we have consistently reviewed the trial court's evidentiary findings, as opposed to reweighing the evidence, to determine whether the findings show impairment or a substantial risk of impairment.

Because the trial court's findings of fact do not support its conclusion Layla is neglected due to the lack of findings addressing impairment of the juvenile or substantial risk of impairment, we vacate the adjudication of neglect and remand for the trial court to make additional findings of fact to address whether and how Respondent-Mother's drug abuse, mental or emotional impairment, or threatening behavior have harmed Layla or have placed her at a substantial risk of harm. Although the findings of fact are not sufficient to indicate that Layla suffered physical, mental, or emotional impairment, or that there is a substantial risk of such impairment, the evidence in the Record could potentially support such findings. We therefore must vacate the trial court's adjudication order and remand for the trial court to make appropriate findings of fact regarding any impairment of Layla or substantial risk of impairment. *See In re J.C.*, 380 N.C. 738, 747, 869 S.E.2d 682, 688 ("Without commenting on the amount, strength, or persuasiveness of the evidence contained in the record, we merely conclude that we cannot say that remand of this case for the trial court's consideration of the evidence in the record utilizing the proper 'clear, cogent, convincing' standard of proof would be 'futile,' so as to compel us to conclude that 'the record of this case is insufficient to support findings which are necessary to establish any of the statutory grounds for termination.'" (citation and internal quotation marks omitted)).

## IV. Conclusion

Having vacated the Adjudication Order and remanded for entry of a new order, we must also vacate and remand the Disposition Order based thereon. *See In re K.J.B.*, 248 N.C. App. at 357, 797 S.E.2d at 519 (citing *In re S.C.R.*, 217 N.C. App. 166, 170, 718 S.E.2d 709, 713 (2011)).

VACATED and REMANDED.

Judges STROUD and STADING concur.